361 So.2d 674 (1978)
Daniel Wayne MALONE
v.
STATE.
6 Div. 123.
Court of Criminal Appeals of Alabama.
June 20, 1978.
Rehearing Denied July 25, 1978.
*675 Marion F. Walker, Birmingham, for appellant.
William J. Baxley, Atty. Gen., and Barry V. Hutner, Asst. Atty. Gen., for the State, appellee.
DeCARLO, Judge.
Murder, first degree; life.
Daniel Wayne Malone was indicted by the Jefferson County Grand Jury for murder in the first degree, charged with the stabbing death of Carol Sue Grayson.
On April 18, 1975, Malone applied for youthful offender status. Following an investigation, the application was denied on June 3, 1975. On that same date, accompanied by his attorney, Malone was arraigned and pleaded not guilty and not guilty by reason of insanity. On August 15, 1975, the State of Alabama filed a petition inquiring into the mental condition of the prisoner. That petition was dismissed on August 29, 1975.
A motion to suppress was filed by the appellant and, after a two-week evidentiary hearing, the motion was overruled.
Beginning on October 29, 1975, a jury trial was begun and on November 1, 1975, the defendant was found guilty of murder in the first degree and was sentenced to life imprisonment.
Notice of appeal was filed and after a motion for a new trial was overruled, the appellant filed a motion to proceed in forma pauperis and it was granted. He is now before this court with a free transcript and appointed attorney.

I
In advance of trial, the appellant moved to suppress the physical evidence and the confession used to convict him. The circuit court denied the defendant's motion to suppress and stated:
"Now after reviewing all the cases as ruled on by the Supreme Court . . . the Court in looking at the totality of the circumstances surrounding the Court finds as a matter of fact, that the Defendant voluntarily, intelligently, without coercion consented to the search of the automobile, consented to the pubic hair combing and consented to the search of the apartment.
"The Court further finds, as a matter of fact, that the Defendant in applying the Fifth Amendment was properly advised as to his rights; that he voluntarily, intelligently and understandingly without coercion, gave a statement on February 6, 1975 to the law enforcement agency."
The appellant contends that the trial court was in error when it overruled the motion to suppress the evidence used to convict him. He insists that his rights under the Fourth and Fourteenth Amendments to the United States Constitution were violated in that he was unlawfully arrested without a warrant and his person, car and apartment were searched without a warrant.
Specifically, Malone maintains that as a matter of fact and law he was arrested when police officers took him from his place of employment, patted him down and detained him for approximately five hours. This arrest, he asserts, was illegal and was without probable cause. Malone argues that no warrant had been issued against him and that, due to the paucity of the information concerning the death of the victim, no semblance of probable cause was present that would indicate his involvement in the girl's death.
Malone further insists that the warrantless search of his person, car and apartment, *676 and the seizure of the physical evidence occasioned thereby, was not premised upon the slightest semblance of probable cause. Malone also states that, at the time of the pubic hair combing, he had not made any incriminating statements, nor had he acted in any manner that could arouse suspicion. He argues that his car was searched outside of his presence, the officers gaining entrance thereto by the use of keys that were unlawfully seized from his pocket. According to Malone, the search of his apartment without warrant was per se unreasonable. He states that the search was not justified because probable cause and exigent circumstances that would justify such a search were not present. It is insisted that the searches occurred during his unlawful detention and constituted invasions of privacy under the Fourth Amendment to the Constitution.
Malone concedes that the confession he signed was not coerced, but avers that the confrontation with illegally seized evidence was a matter of fact and law an inducement that mitigated the voluntary nature of the confession. Specifically, Malone urges that the physical evidence and the confession used to convict him should have been suppressed by virtue of the application of the fruit of the poisonous tree doctrine.
The record of the suppression hearing reveals the following facts.
On February 6, 1975, at 12:35 P.M. Mrs. Susie Grayson found her daughter, Carol Sue, in her home stabbed to death. The girl was lying on a bedroom floor, her nude body being partially covered with bedding. Her throat had been cut. Mrs. Grayson called the police and Officer Larry Evans of the Fultondale Police Department arrived at approximately 12:45 P.M. Subsequently Chief Finn of the Fultondale Police Department arrived, followed shortly by Sgt. Graham and Coroner Robey, both with the Jefferson County Sheriff's Department.
On the morning of February 6, 1975, Mrs. Grayson got up around 6:30 A.M. At 7:00 A.M. Carol Sue got up. At 7:45 A.M. Mrs. Grayson took one of her sons to school, arriving back home around 8:15 A.M. Around 9:30 A.M. Mrs. Grayson left for work, leaving her four-year-old son, Phillip, and Carol Sue at home. Carol Sue called her mother at work at 11:30 A.M. It was 12:15 P.M. when Mrs. Grayson called Carol Sue and Phillip answered the phone, telling her that she would have to call back because Carol Sue was doing her homework. Phillip then left the telephone and did not return. Mrs. Grayson became worried. She left work around 12:30 P.M. to go home for lunch.
At 12:35 P.M., Mrs. Grayson arrived at home and found her son at the door crying. She entered the house and found her daughter's bedroom door locked. After getting a screwdriver, Mrs. Grayson forced the door open, entered the room, and found her daughter's body. She then called the police and her pastor. At 12:45 P.M., the Fultondale Police arrived at the Grayson home.
During the suppression hearing Mrs. Grayson further testified that she gave the police several names of her daughter's acquaintances, including Danny Malone, Kenneth Alexander, Billy Shirley, Nelda Aycock and Regina Donaldson. Mrs. Grayson admitted, however, that she told the police nothing about Danny Malone that would have set him apart from the others. She further testified that the police officers questioned her four-year-old son, Phillip. Phillip told the officers that he had seen a "blond-headed" male leaving the house by the front door. He also told them that he saw a green car parked behind the house.
On February 6, 1975, Officer Larry Evans was at the Fultondale City Hall. At 12:45 P.M., a dispatcher received a call and relayed it to him. Pursuant to the telephone call Evans left the city hall and was the first to arrive at the Grayson home. Mrs. Grayson met him at the door and told him that her daughter had been murdered. After telling Mrs. Grayson to have a seat on the couch, Evans went into the bedroom and viewed the body of Carol Sue Grayson.
*677 William Finn, the Chief of Police for the City of Fultondale, arrived at the scene shortly after Officer Evans. Evans and Finn took pictures of the bedroom where Carol Sue Grayson had been murdered. According to Evans, Coroner Robey arrived at the Grayson home around 1:05 P.M. and Sgt. Graham of the Jefferson County Sheriff's Office arrived at 1:15 P.M.
Evans said that he questioned Mrs. Grayson and that she gave him the names of Billy Shirley and Danny Malone. He testified those were the only two names he received from Mrs. Grayson.
Evans stated that he also talked with the victim's brother, Phillip. Phillip told him that he had seen a man with blond hair, but said nothing about a car at that questioning.
At 2:20 P.M., Evans left the Grayson home and went to Fultondale High School to check on Billy Shirley. He talked with the principal, one teacher and to Billy Shirley. He discovered that Shirley had been in school all day and that he owned a motorcycle. Evans also talked to Regina Donaldson, and to several other girls. According to Evans, it was Regina Donaldson that gave him the name of one Kenneth Alexander.
Chief Finn had met Evans at Fultondale High School and the two had left the school in separate cars at 3:00 P.M. From there they went to the Gardendale Police Department to meet with Sgt. Graham. On their way they went by Fultondale City Hall to drop off one of their cars.
At 4:00 P.M., Finn and Evans arrived at the Gardendale Police Department. Finn, Evans and Graham then went to a Malone residence which proved not to be that of Danny. They returned to the Gardendale Police Department in an attempt to get another address.
At 4:45 P.M., Finn, Evans and Graham again left the Gardendale Police Department and went to an address given to them by Lt. Lawley. They first stopped at a Shell station to question another individual named Malone but were only there approximately thirty seconds. They arrived at the address, 713 Peterson Drive, and talked to one Michael Malone, Danny Malone's brother. Michael Malone told them that he had a brother, Danny, who worked at ACIPCO. He further told them that his brother, Danny, had a green Volkswagen.
The officers then went to ACIPCO, arriving there at 5:05 P.M. A Sgt. Amberson met Finn, Evans and Graham at the plant around 5:10 P.M.
According to Evans, it was approximately 5:30 P.M. when the officers first talked to Danny Malone. A security guard and Chief Finn had gone into the plant to get Malone, while the other officers stayed with the security guards at the main entrance to ACIPCO. Evans testified that when they first talked to Malone, no rights were given to Malone, there was no arrest and he was not sure whether there was a pat-down or frisk of Malone's person.
At 5:40 P.M., Sgt. Graham asked Malone if he would mind coming to the sheriff's office to talk with them. Malone agreed. Evans said that Malone did not ask to make a telephone call at any time while he was at ACIPCO. When Malone was taken to the sheriff's office there was one officer in uniform and the other three were in plain clothes.
Malone was placed in Sgt. Graham's car with Chief Finn sitting in the front seat and Evans and Malone in the back. At that point, no handcuffs or physical restraints were placed on Malone's person.
At 6:00 P.M., the officers and Malone arrived at the sheriff's office. They went to a Lt. Sexton's office by way of the basement of the courthouse.
The officers asked Danny to give an account of his activities during that day. Danny told them that on that morning he had gone to Jack's Hamburgers and then gone back home. He picked up his father and they went to an apartment that he had rented at 1941 Eastlake Blvd. There he stayed for a while and then went to have lunch with his fiancee. Evans said that his fiancee verified this when he called her at work at the Rochester Corporation.
*678 Evans testified that Malone stayed at the sheriff's office approximately one and one-half hours. He further said that Malone never asked to make a telephone call and that while in the office where Malone was being questioned, the phone that, was on the desk never rang. Malone was asked if he wanted coffee and he told them that he did not.
Coroner Robey arrived and suggested that the officers try to obtain a pubic hair combing from Malone. They asked Malone if he would submit and he told them that he would be glad to help them in any way that he could. Evans said that Malone was calm at all times and that all four officers did not remain in the room at all times but were in and out.
On cross-examination, Evans said that Malone had given the officers names of several other boys that had been having sexual relations with the victim, but that none of the names were, in fact, checked out. Evans further admitted that Malone was not told that he did not have to go to the hospital and have a pubic hair combing if he did not want to, or at no point was he told that he was free to go. Evans said that he was not aware at that time that Malone's father or Malone's attorney was trying to get in touch with him.
At 7:45 P.M., Evans, Graham and Malone left the sheriff's office enroute to Mercy Hospital. Chief Finn did not accompany them to the hospital but went back to ACIPCO.
They arrived at Mercy Hospital at 8:00 P.M., and were told by a woman at the hospital that Malone would have to sign a release form before the combing could be administered. After waiting several minutes a technician employed by the hospital came down to get Malone to perform the combing. Malone left with the technician at approximately 8:25 P.M. The officers did not accompany the technician and Malone into the treatment room where the combing took place. At 8:30 P.M., Malone returned where the officers were waiting.
Evans testified that by this time Chief Finn had come to Mercy Hospital where they were. Out of the presence of Malone, Finn told the other officers that he had searched Malone's car and had found a sack of clothes. Evans said that he could not remember whether anyone had asked Malone if his car could be searched.
While at the hospital Malone was asked if he would object if the officers went to his apartment on Eastlake Boulevard. Malone said that he did not. Evans testified that Malone was still calm and very cooperative.
At 8:40 P.M., Evans, Graham and Malone left Mercy Hospital en route to Malone's apartment. Evans said that at that point the officers were still conducting themselves as if they were conducting an investigation.
The three arrived at the apartment at 9:00 P.M. Evans said that Malone put his key in the lock of the front door and opened it. He further testified that Malone was still not under arrest and had still not been searched. Malone went into the apartment and sat on a stepladder in the kitchen. The only furniture in the apartment was the stepladder and a stereo. Evans went into the bathroom and, on a pipe in a shower stall, found a spot of something that looked like blood. Evans also found a bayonet on a shelf in Malone's closet. While Evans was searching the interior of the apartment, Sgt. Graham was searching the premises surrounding the building.
Around 9:30 P.M., Chief Finn arrived at the apartment with Sgt. Amberson. Chief Finn and Graham came inside the apartment. Evans showed them the bayonet and Graham told Evans that he had found bloody clothing in a garbage can outside the apartment. Graham then advised Malone that he was a suspect in the stabbing death of Carol Sue Grayson. Malone was then placed under arrest and as Graham was reading Malone his rights, he said that he already knew them because he was an M.P. in the National Guard. Malone was then handcuffed, placed inside Graham's car and taken back to the sheriff's office.
After arriving at the sheriff's office at approximately 9:55 P.M., Malone was again *679 taken back to Lt. Sexton's office. Present in the office were Evans, Graham, Amberson, Finn and Malone. Malone was shown a rights waiver, which he signed. Shortly thereafter, according to Evans, Malone told him that he killed Carol Sue Grayson.
Evans said that Malone was not coerced. Malone at first, began giving the same statement that he had made previously. Graham interrupted him and said: "You know what I have got?" Malone replied, "No," and Graham told him to look out the window in the door. Malone looked out and saw the garbage can containing the bloody clothes. Malone then turned around and said that he would make a statement. That statement amounted to a confession to the murder.
According to Evans, only Graham, Evans and Malone were in the room when the statement was made.
Malone's statement indicated that he went to the victim's house around 10:15 A.M. and had sexual relations. He then left and later returned at 11:15 A.M. and again had intercourse with her consent. An argument ensued and Malone stabbed the girl with a bayonet. According to Malone he panicked, went back to his apartment, took a shower and dressed and then went to see his fiancee at Rochester Corporation arriving approximately at 12:00 noon. He stayed there until he left for work at 2:00 P.M.
Evans insisted that Danny Malone was not placed under arrest until after the officers had found the bayonet and the bloody clothes.
Charles C. Robey, a deputy coroner for Jefferson County, next testified that on February 6, 1975, he received a telephone call at 1:00 P.M., informing him of a homicide at 2115 Fulton Avenue in Fultondale. He went to the residence and made an investigation. He subsequently left at 2:00 P.M., and went to Mercy Hospital. There at 3:10 P.M., he observed an autopsy being performed on the victim.
At 6:10 P.M., Robey went to the sheriff's office, arriving at 6:30 P.M. He proceeded to the room where Sgt. Graham was questioning Malone. According to Robey, Malone at that point was calm.
Robey testified that it was one of the detectives that suggested that a pubic hair combing be performed on Malone. Robey asked Malone if he would be willing to go to Mercy Hospital for the combing and Malone said that he would be glad to.
At 7:45 P.M., Robey went to Mercy Hospital. There he saw Malone, explained the procedure and showed him a form. The form was, in fact, an authorization to take a blood sample but Robey altered it to cover pubic hair and informed Malone of that fact. Malone read the authorization as Robey read it and then signed it. It was witnessed in Malone's presence. Robey testified that Malone was in no way coerced.
Sgt. Graham of the Jefferson County Sheriff's Office was then called to testify on the motion to suppress. He stated that he arrived at the victim's house at 1:15 P.M. Already present at the home where Coroner Robey, Chief Finn and Officer Evans. Graham talked to Finn and Evans then went inside and talked to Mrs. Grayson and Phillip. Mrs. Grayson supplied Graham with the names of Danny Malone and Billy Shirley. Graham said, at that point, she supplied no other names.
Graham testified that he also talked to Henry Dover, Mrs. Grayson's brother and Carol Sue Grayson's uncle. According to Graham, Dover told him that he had called and talked with Carol Sue Grayson at 12:00 noon trying to get in touch with her mother. He said he later called back at the Grayson home and that the "phone was busy."
Graham left the house at 2:00 P.M. and went to the Gardendale City Hall. There he made inquiries, looking for Danny Malone. After three and one-half hours he located Malone at ACIPCO. Chief Finn and Officer Evans went with Graham to ACIPCO. Sgt. Amberson drove a separate car and met the three at ACIPCO.
Graham testified that Chief Finn told Malone that he would like to talk to him *680 and take a statement at the sheriff's office. Malone agreed. Graham stated that he could not remember any shakedown or frisk made of Malone at ACIPCO. Graham, Evans, and Malone went in one car to the sheriff's office. Chief Finn and Sgt. Amberson followed in another car.
At 5:50 P.M., the men arrived at the sheriff's office. The side doors to the courthouse were locked so the men entered the courthouse by way of the front entrance. They went through a locked door, down some stairs and entered the criminal division. After entering Lt. Sexton's office, Graham, Finn and Evans began questioning Malone. Graham indicated that he was the primary interrogator at that point.
Malone made a statement concerning his association with Carol Sue Grayson. He said he had met her at the "Eastern Star Horror House on October 31st." According to Malone, he had intercourse with her on that night and again had relations with her during the month of November. He further said that he had seen her a couple of times since.
Malone insisted that he had not seen Carol Sue Grayson on the day of the murder. Graham said at that point he and the other officers had no reason "not to believe" Malone's statement.
Malone then proceeded to relate his activities of the day of February 6, 1975. He said that he got up that morning around 8:00. At that time he was still living at his parent's home. He and his father went over to an apartment that he had rented but had not moved into. They worked at the apartment for a while, then Malone went to the Jiffy Check and bought two barbecues and returned home and ate them. He then read several comic books. Malone said at that point he thought he may have left his stereo on at his apartment and he went back to check. At 12:00 noon he called his fiancee, Debbie Fields, at the Rochester Corporation. At 12:30 P.M., he arrived there at Debbie Field's office and remained there until 2:05 P.M., when he left for work at ACIPCO.
Graham questioned Malone until approximately 6:45 P.M. He left Malone in Lt. Sexton's office and went to get a cup of coffee. He asked Malone if he wanted something to drink and Malone replied that he did not. Chief Finn and Officer Evans picked up the questioning at that point.
Deputy Coroner Robey had arrived at the sheriff's office and suggested to the officers that they ask Malone if he would submit to a pubic hair combing. Robey asked Malone about the combing and Malone said he did not mind having it.
Graham testified, that at 7:45 P.M., the men took Malone to Mercy Hospital. Chief Finn and Sgt. Amberson did not go to Mercy Hospital but went back to ACIPCO. Finn said he got permission from Malone to search his car that was still parked at ACIPCO, but Graham testified that he could not remember if Finn, in fact, got such permission.
Evans, Malone, and Graham arrived at Mercy Hospital at 8:00 P.M. Corner Robey was already present and had talked to a nurse and a doctor about performing the combing. After approximately twenty-five minutes a doctor arrived and took Malone back to an examining room. None of the officers accompanied them. Malone returned to where the officers were waiting in approximately five minutes.
On direct examination, Sgt. Graham testified that Malone was asked if his apartment could be searched while they were still at the sheriff's office with Finn, Evans and Graham present. On cross-examination, Graham said that Evans asked Malone at the hospital, after the combing, if his apartment could be searched. At that point, Malone agreed. Malone was never asked if the officers could search on the outside premises of the apartment.
Finn and Amberson came to Mercy Hospital while the officers were still there and told them that they had found a sack of clothing in Malone's car. Graham testified that he did not know how Finn got the keys to Malone's Volkswagen.
*681 After leaving Mercy Hospital, Evans, Graham and Malone went to Malone's apartment on Eastlake Boulevard. Finn and Amberson had gone back to ACIPCO to take pictures of Malone's automobile. After arriving at the apartment, Malone opened his apartment door with his keys and then left the keys in the door. Finn later took the keys when they left the apartment. Malone went into the kitchen and sat on a stepladder.
Graham testified that he searched the drawers and cabinets in the kitchen and then went outside to have a look around. While outside, Graham looked into five or six garbage cans and found bloody clothing in about the third one. On finding the clothes, Graham said that he waited for Finn and Amberson to arrive. When they arrived, he showed them the bloody clothing and they all went back into the apartment.
They went into the kitchen where Malone was seated and told him that he was under arrest for the murder of Carol Sue Grayson. Graham said at that point he proceeded to read Malone his rights. While Graham was reading him his rights, Malone interrupted him and told him that he already knew them because he was an M.P. in the National Guard. Graham handcuffed Malone, patted him down, and placed him in the car, then took him back to the sheriff's office.
The men arrived back at the sheriff's office at approximately 9:45 P.M., and returned to Lt. Sexton's office. Graham read the rights again and showed Malone a rights' waiver form which he signed. At that point, Graham began taking another statement from Malone which conformed to the statement that Malone had previously given. Graham said he interrupted Malone and told him that they had his clothes. He told him to get up and look out the window where his clothes were being tagged as evidence. According to Graham, he then told Malone to tell the truth. At that point, Malone made a statement which amounted to a confession. Graham wrote the statement down. The statement ended around 10:20 P.M., and Malone was placed in jail at 10:28 P.M.
After Malone confessed, but not before, Graham asked him if he would like for him to call his parents. Malone said, "no, that he didn't want to call his mother and his father was not home from work yet and that he could call his father later."
On cross-examination, Graham admitted that no one ever told Malone that he did not have to go to the sheriff's office from ACIPCO, that he did not have to go to the hospital to have a pubic hair combing performed or that he did not have to go to his apartment if he did not want to.
It was further elicited on cross-examination, from Graham, that to get out of the courthouse on February 6, 1975, someone would have had to unlock the doors before they could leave.
Chief William Finn was at the Fultondale City Hall at 12:45 P.M., when a radio dispatcher called and told him of the homicide. Finn left the courthouse and arrived at the Grayson home at approximately 12:55 P.M.; Officer Evans and a Sgt. Fassina were already present. Finn testified that he talked to Mrs. Grayson and that Evans had talked to her also. He said that Mrs. Grayson had given Evans the names of Malone and Billy Shirley. Finn said that he also heard Phillip tell Graham that he had seen a blond boy in a green car.
Finn left the Grayson home around 2:00 P.M., and went back to City Hall. From there he went to Fultondale High School, where Officer Evans was already making inquiries. Evans was questioning three girls in the principal's office when Finn arrived. Finn talked with the principal, a teacher and three students and discovered that Billy Shirley had been in school all day. Evans and Finn then left Fultondale High School in separate cars and went to Gardendale City Hall. While at City Hall, they tried to find the address of Danny Malone. They went to a Malone residence on Odum Road in Gardendale but discovered it was not the address of Danny Malone. They then went back to the Gardendale City Hall. Then all three men, Evans, Graham, and Finn, went to Peterson Drive, Danny *682 Malone's residence. There they learned from Malone's brother that he was at work at ACIPCO. The brother also told the officers that Malone owned a green Volkswagen. While the officers were at the residence, Malone's brother called his mother and told her that the police were looking for Danny. The officers left in the same car, went to Fultondale City Hall, and, from there, went to ACIPCO.
Finn testified that at that point, the officers only knew that a blond-haired male in a green car was at the residence and that Danny Malone was an acquaintance of the victim.
At 5:15 P.M., the officers arrived at ACIPCO. Sgt. Amberson arrived in a second car and met the other three officers in the parking lot. The officers then talked to the guard in the parking lot who took them to the main lobby. There Finn talked to the sergeant in charge. Finn testified that he told the sergeant that he wanted to talk to Danny Malone. He accompanied the sergeant to the department where Malone worked. According to Finn, he asked Malone if he could talk with him. Malone agreed and accompanied Finn and the sergeant to the front office. Finn stated that, when they got to the front office, he asked Malone to come down to the sheriff's office and Malone replied that he would be glad to do so.
Finn insisted that Malone was not searched at ACIPCO and that he did not take any keys from him. Defense counsel brought out the fact that, at the preliminary hearing, Finn stated that he had obtained some keys from Malone, but at the suppression hearing his testimony was that he did not remember getting any keys from him.
When Malone was told that he was to come to the sheriff's office, he wanted to know if he could take off his work clothes. The officers told him at that time that it would not be necessary. Evans, Finn, Graham and Malone all rode back to the sheriff's office in the same car.
The group arrived at the sheriff's office approximately 6:00 P.M., and went to the detective division. There Malone was told that the officers were investigating the death of Carol Sue Grayson. Sgt. Graham took a statement from Malone and Finn testified that he was present at all times.
During the questioning, Evans left the room where Malone was being held and Graham went to get coffee. Finn stated that at that time he picked up the questioning. According to Finn, he asked Malone what clothing he had on. Malone told him that he did not have any underwear on because it was too hot at work to wear any.
Finn admitted on cross-examination that Malone was never told that he could use the telephone while he was being held in the detective division. While talking to Finn, Malone stated that he was getting hot and so he took off a pair of his pants and a sweatshirt. Finn further said that Malone wanted a "coke" at one point but that there was none. Finn insisted that Malone was cooperative at all times.
Finn testified that, while Malone was being questioned, Deputy Coroner Robey arrived and brought up the possibility of having a pubic hair combing performed. According to Finn it was Robey who asked Malone to submit to one, to which Malone agreed. Malone was then taken to Mercy Hospital. Finn recalled that at 8:00 P.M., he and Sgt. Amberson left the sheriff's office and returned to ACIPCO for the purpose of looking in Danny Malone's car. Finn stated that he had asked Malone if they could search his car and that he replied that they could do so. Finn had the keys to Malone's car, but, when asked on cross-examination where he got them, he said that he could not remember. He did not recall if Danny Malone had given him the keys to his car. Finn stated that Malone did give him a description of the car, including the fact that it had a National Guard tag and where in the parking lot it was located.
The two officers searched Malone's car and found a bag of clothing on the back floorboard. In the bag was a jacket, bluejeans, and a pair of socks. The officers took these items and locked Malone's car.
*683 Finn testified that there were "make-up like" stains on the inside of the pants. Amberson and Finn left ACIPCO and went to Mercy Hospital.
According to Finn, when Malone returned from the pubic hair combing he was asked if the officers could search his apartment. He agreed and said that he would go with them. Graham and Evans took Danny Malone to his apartment. Finn stated that he and Amberson went back to ACIPCO to take pictures of the car. From ACIPCO, Finn and Amberson went to Danny Malone's apartment to meet Graham and Evans. Finn said that when they arrived at the apartment Graham was outside. He showed them a bloody shirt, undershorts, and a undershirt, of which were found in a garbage can outside Malone's apartment.
Finn took custody of the can, put it in Amberson's car and locked the door. They then went into the apartment where Graham placed Malone under arrest.
Evans was in the apartment when the other men arrived and had a bayonet, which he gave to Finn. While Graham was reading Malone his rights, Malone interrupted him and stated he already knew his rights because he was a M.P. in the National Guard.
The officers left the apartment with Malone, and Evans locked the door. Finn stated that he was not sure where Evans had obtained the keys but that Evans kept the keys after locking the door. The keys were later turned over to Malone's father.
According to Finn it was about 9:45 P.M. when the men left the apartment and went back to the sheriff's office. Finn was with Amberson, and Malone was with Evans and Graham. Malone, Evans and Graham were already present when Finn and Amberson arrived.
Finn carried the can containing the bloody clothing into the detective division. Malone was in a lieutenant's office that had a window looking out into the detective division. Finn said that he took the articles out of the can and got some envelopes to put the bloody clothing in. Finn recalled he stayed in the detective division and Graham came out and told them that he had obtained a confession from Malone. Finn stated that he did not talk to Malone after he had been brought back from his apartment.
Finn said that sometime after eleven o'clock when he had returned from the courthouse, he talked with Malone's father. According to Finn, Malone was not coerced, nor physically restrained prior to his arrest. Further, Finn said that he had no knowledge that any attorney or any member of Malone's family was trying to teach Malone while Finn was talking with him. He stated that when he returned to the courthouse from Malone's apartment, he was not aware of any messages from a Willard Malone or a Don Jones.
The first witness called on behalf of the defense was Don Hugh Jones who had been one of Malone's attorneys. Jones testified that on February 6, 1975, Gene Malone, Danny Malone's older brother, called him. As a result of the call, Jones called the Fultondale Police Department at approximately 6:30 P.M. and talked to the dispatcher. He asked if they had a Danny Malone in custody and was told they did not. He was told that he would have to talk to Chief Finn and that Finn was not in at that time, and that he would either have to call back or leave a message. Jones stated that he left his name and number and requested that Finn get in touch with him. Further, Jones testified that he told the dispatcher that it concerned Danny Malone and said that he knew they had picked him up at ACIPCO and wanted to know his whereabouts.
Jones next called the Jefferson County Sheriff's Department and asked if Malone was there. The person with whom he spoke said that she did not know of a Malone being at the sheriff's department and told Jones to check the jail. Jones then called the jail and was told that they did not have a Malone incarcerated.
Jones next called ACIPCO again. Jones said that he spoke with a security guard who told him that he would have to talk to a Sgt. Tim Wood. Wood told Jones that *684 Malone had left with Chief Finn, Officer Evans and two other people from the Jefferson County Sheriff's Department. Jones placed another call to the Jefferson County Jail and asked them to check and see if Malone had been there. Jones stated that he definitely knew that Malone had been been picked up around 5:30 P.M. from his place of employment.
Jones said that during his second call to the sheriff's office, the lady with whom he spoke earlier told him that she had seen some men on her monitor downstairs with someone, but that she could not see them at that time. She said that they had gone down a corridor into a back office. Jones stated that she either gave him the number of the office and told him to call, or connected him to the office phone. The phone rang five or six times but no one answered. Jones then called Gene back and told him that he could not reach Danny. He again called the number that the lady had given him, but still there was no answer.
Sometime after 7:00 P.M. Jones called the Jefferson County Jail for a third time. Between 10:00 and 11:00 P.M., he once again called the jail and was then told that Danny Malone was in custody.
Willard Eugene Malone, Danny Malone's father, was an electrician at U. S. Steel, working the day shift from 3:00 to 11:00 P.M. On February 6, 1975, he received a phone call at approximately 6:30 P.M. and left shortly thereafter. Arriving at home around 7:00 P.M. he found his oldest son, wife, youngest son, and his middle son's girl friend, present. As he entered the house, his oldest son was on the telephone. When he hung up, Willard called the Fultondale Police Department and asked to speak to Chief Finn. Willard Malone testified that he did not talk with Chief Finn, but left his name and number and asked that Finn return his call.
Willard Malone and a Mr. Fields left his home to look for Danny. At 7:30 P.M., they went to the Fultondale Police Department. They talked to an Officer Fassina, and asked if he had seen Danny. Another officer, Blackie Hogeland, said that he had not seen Finn or Malone. The two men then drove around Fultondale still looking for Danny. Sometime after 8:00 P.M. the two men went home and called the sheriff's office. Mr. Malone testified that he was told that they did not have his son, Danny, in jail.
Jimmy Ray Young, a security guard at ACIPCO, testified that on February 6, 1975, around 6:00 P.M., he stopped some police officers in the back parking lot of ACIPCO. He took them to the front office and called Sgt. Wood.
Young stated that he saw Danny Malone when he was brought to the main entrance by Sgt. Wood and Chief Finn. At that point, according to Young, the officers told Malone that they would like to take him downtown. Malone asked if he could change pants and was told that that would not be necessary.
The officers left the building with Malone and, according to Young, the officers searched Malone. Malone leaned against the policeman's car and was patted down. Young said he then stood up, pulled down the top pair of his pants, leaned on the car again, and was patted down for a second time. Malone then got into the car with the three police officers.
Young testified that Malone was searched behind the left rear door of the patrol car. Young was standing on the building platform five to ten feet away from the car at the time of the search. He further remembered that Malone had his hands on the car and was leaning on such with his feet spread.
Young said that Malone was calm and cooperative and that he heard no charges being made or any coercion being used. He did not see the policemen take any keys from Malone but he said that the patrol car Malone was leaning on was between himself and Malone when the search was conducted.
Appellant was next called to testify and stated that on February 6, 1975, he was working at ACIPCO. At approximately 5:30 P.M. Chief Finn and a security guard *685 approached him in the shop where he was working. He said that the guard told him that Chief Finn wanted to talk to him. Finn asked him his name and inquired as to whether or not he drove a green car. Malone accompanied Finn and the security guard to the main building. Malone testified that he had two pairs of pants on that day.
Graham told him that they wanted to take him to the sheriff's office and Malone agreed. Malone testified that the security guard offered them the use of an office at ACIPCO, but Graham declined. Malone stated that he asked the officers if he could change clothes but was told by Graham that it would not be necessary.
Malone said that after he was taken outside to the car, Graham told him to put his hands against the car and that at that time Finn and Graham searched him. Malone indicated that the pat-down by Finn revealed the car keys in his pocket. When Finn reached into his pants pockets to get the keys, Malone told him that they were in the inside pants pockets. At that point, Malone dropped his pants and Finn reached in and took the car keys. According to Malone, Finn kept the keys.
Malone said that Chief Finn opened the car door and he got in. Also Malone recalled that Finn held his arm as he got into the car. Further, Malone stated that he asked Graham if he could call his mother and was told that he could do so when he got back to the station. When the officers and Malone arrived at the sheriff's office, Graham opened the car door and accompanied Malone to the sheriff's office. Malone said that the first door they attempted to enter was locked and so the men took him around to the main entrance. They went through the door at the main entrance and then through another door which was locked. Malone said that he and the three officers went to an office inside the sheriff's department.
Malone indicated that Graham asked him for a statement concerning his whereabouts and he made one.
Malone testified that at that point, he was very frightened and scared. He further said that he asked to use the phone that was sitting on the desk but Graham told him that he could not do so.
Malone recalled that Sgt. Amberson came into the office where he was sitting and got a gun and camera out of a desk drawer and left. Several moments later he came back in and told Danny that he was going to take his picture. Malone said he stood up and Amberson took a forward and profile shot, then left the office. A few minutes later Amberson came back in and told Malone he would have to take the pictures again because the first ones did not turn out. Amberson then took two more pictures, telling Malone that this was normal procedure.
Deputy Coroner Robey next came in the room and told Malone he wanted to take a pubic hair sample. After explaining to Malone what it was, Robey told him that he would have to go to Mercy Hospital to have the pubic hair combing performed. Malone agreed. According to Malone, at one desk the phone rang approximately eight or nine times. While it was ringing, Graham, Evans, and Finn were in the room but none of them answered it.
Malone said that Evans and Graham took him to Mercy Hospital. According to Malone, Robey was already at the hospital and, after entering the hospital, he was shown a form. Robey told him it was a blood sample form but that he was going to cross out the word blood and put in pubic hair. He read the form along with Robey and signed it.
A few minutes later a doctor came in and took Malone to a treatment room. In that room were two people, one was dressed in a green smock and the other in a suit. After the pubic hair combing was performed, Malone came out of the treatment room and was told to wait.
About five minutes later Finn and Amberson came in and talked to Graham, Evans and Robey. Malone said that while they were talking, Finn handed some keys to Evans. Evans then came over and told *686 Malone that they wanted to go to his apartment, to which Malone replied "okay."
Graham, Evans and Malone left the hospital in one car and went to Malone's apartment. When they arrived Evans took out the keys he had in his possession and opened the apartment door.
Once inside, Malone went over to his stereo to turn it on but was told not to do so. Malone said that he walked over and picked up his phone, at which time Evans took the phone away from him and told him to go over and sit on the stepladder located in the kitchen. Malone testified that Graham went outside while Evans remained in the apartment.
Malone said that Evans found his bayonet, came into the kitchen, and asked Malone if it was his. Malone said that it was. Graham then came back into the apartment and was shown the bayonet. Evans said that it could be a murder weapon. Malone said at that point Graham went back outside.
A few minutes later, Graham came back into the apartment with Finn and Amberson. Malone testified that it was at that time that Graham arrested him and read him his rights. Malone said he interrupted Graham while he was reading him the rights and told him he already knew them. After the rights were read to Malone, Graham handcuffed him and he was taken back to the sheriff's office.
Malone said that upon their arrival at the sheriff's office he was taken to the same room that he had been in before. He said that he signed a rights waiver form and was told to tell the officers once again what he had done on that day, February 6, 1975. Malone said that he began giving the same statement that he had given earlier when Graham interrupted him and said, "You know what I've got." Malone said that he did not and Graham told him to look out the door. Malone complied and saw the bloody clothing that the officers had found in the garbage can at his apartment. According to Malone, Graham asked him again if he wanted to make a statement, to which Malone replied, "Yes." It was then that Malone gave a confession.
Following the confession, Graham asked if he wanted to call anyone and Malone said that he told them that he did not at that time.
Malone testified that he was never told that he did not have to do what had been requested of him and that Finn never asked if he could search his car. Further, Malone said that he was not searched after he was arrested at his apartment. He testified there was no coercion or offer of hope or reward given in return for his making a confession. Malone added that he understood all of his rights.
Deputy Amberson did not testify because he was hospitalized at the time of trial.
At the conclusion of the evidentiary hearing the trial judge overruled the motion to suppress. The physical evidence and the statements, along with substantially the same testimony as presented during the suppression hearing, were presented in the State's case in chief. The defense did not make a motion to exclude the State's evidence. Counsel, however, did present three expert witnesses in an attempt to show that the appellant was suffering from a mental disease, to the point that he could not control himself at the time of the stabbing. The expert witnesses were Mr. Carl Clements, Dr. Ames Robey and Dr. Samuel Little.
Mr. Clements diagnosed Danny as suffering from "episodic dyscontrol" and said that as a result of this disease or defect he was unable to avoid the act that he was charged with committing.
Dr. Robey confirmed this diagnosis and attributed it in part to organic brain damage suffered by Malone as a result of a motorcycle accident. Dr. Robey testified that in his opinion Danny Malone was so affected by the mental disease that he had lost the power to choose between right and wrong and could not avoid doing what he did.
At the conclusion of the testimony by the expert witnesses, nothing further was presented by the defense.
*687 The State, at that time, called four witnesses in rebuttal who testified that they had known Malone during his school years or at work and it was their opinion that he was sane.
The State also called John F. Webb, who testified that he witnessed the motorcycle accident involving Danny Malone. He stated that he talked with the appellant immediately after the accident and that he was conscious. He said that Malone told him that his foot was hurt. He added that he did have a helmet at the time.
Debra Fields was also called in rebuttal by the State, and stated that she had known Danny Malone since 1972, and that they were engaged to be married. She testified that, on the day of the stabbing, she saw the appellant at her place of employment around 12:30 P.M. He had brought her lunch and they had discussed their wedding plans.
She said the next time she saw the appellant was in jail on Sunday afternoon. She stated that she again saw him Monday night after he had been released on bail and at that time, while at the residence of his parents, Malone told her that he had killed Carol Sue Grayson. Fields stated that the appellant told her that: "[I]f I told anybody that he had confessed to me that he would tell them that I was lying and that I didn't know what I was talking about." At the end of Miss Fields' testimony, the State completed its rebuttal and the trial concluded.
In his motion for a new trial the appellant did not raise the sufficiency of the evidence. In view of this and the fact that no motion to exclude was made, nor a written affirmative charge requested, the question of the sufficiency of the evidence is not presented for review.
The only question presented is whether the trial court was in error when it denied the defendant's motion to suppress.
The State contends that Malone was not arrested at his place of employment (ACIPCO), but merely became the subject of routine investigation at the time in which he fully cooperated. Also, the State agrees with the appellant's contention that at the time Malone was picked up at ACIPCO there was no probable cause for an arrest. Counsel for the appellant maintains that Malone was, in fact, arrested "when police officers took him from his place of employment, patted him down and detained him approximately five hours." It is insisted that the alleged arrest was illegal in that there was no warrant issued and no probable cause at the time.
The crux of the issue is whether the pre-arrest questioning of Malone should be characterized as "custodial interrogation," or as traditional investigatory procedure beyond the reach of Miranda.
At the outset, we note that great weight must be given to the trial court's finding that there was no custodial interrogation prior to the warnings and that the admissions were voluntary. Balentine v. State, Ala.Cr.App., 339 So.2d 1063; Elliott v. State, Ala.Cr.App., 338 So.2d 483; Garrett v. State, Ct. of Criminal App. 6 Div. 508 (April 18, 1978).
The law is clear that where a conflict in evidence exists, a question for the jury is presented. Pugh v. State, 51 Ala. App. 164, 283 So.2d 616. It is not the policy of this court to pass upon the truthfulness or the falsity of such conflicting evidence. Williamson v. State, 57 Ala.App. 113, 326 So.2d 303; Snipes v. State, 50 Ala.App. 139, 277 So.2d 413.
The Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, defined custodial interrogation as:
". . . questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."
In Miranda v. Arizona, supra at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706 n.4, the court stated:
"This is what we meant in Escobedo when we spoke of an investigation which had focused on an accused."
In Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, the court stated:

*688 "We hold only that when the process shifts from investigatory to accusatory when its focus is on the accused and its purpose is to elicit a confessionour adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer."
Miranda v. Arizona, supra, requires that, at the time the person is taken into custody or otherwise substantially deprived of his freedom, he must be advised of his constitutional rights. The purpose of the warning procedures in Miranda as stated in United States v. Montos, 5 Cir., 421 F.2d 215, is to:
"`[G]ive meaningful protection to the Fifth Amendment rights.' Mathis v. United States, 391 U.S. 1, 4, 88 S.Ct. 1503, 1505, 20 L.Ed.2d 381 (1968), by dispelling the `compulsion inherent in custodial surroundings.' Miranda v. Arizona, 384 U.S. 436, 458, 86 S.Ct. 1602, 1619, 16 L.Ed.2d 694 (1966). Since the vice against which the privilege against self-incrimination protects is compulsion, legal or factual, in the process of interrogation, see Hoffa v. United States, 385 U.S. 293, 303-304, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966); United States v. Burr (In re Willie), 25 Fed.Cas. 38, 40 (No. 1469e) (C.C.D.Va. 1807), the necessity for observance of the Miranda ritual depends upon whether compulsive factors are present in the circumstances under which questioning is conducted."
In Montos, supra, the court ruled that it was the compelling atmosphere that the Miranda procedure was intended to combat.
The United States Supreme Court in Miranda, supra, noted that it did not intend the requirements of the Miranda warnings to preclude the police from ever asking questions of material witnesses during an investigation prior to giving the admonitions. The court noted in Miranda, supra, that:
"Our decision is not intended to hamper the traditional function of police officers in investigating crime. See Escobedo v. Illinois, 378 U.S. 478, 492, 986, 84 S.Ct. 1758, 12 L.Ed.2d 977. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present."
The line between general investigation and custodial interrogation or when it is crossed is not easily determined. Each case must turn upon its own particular facts. Reviewing courts have employed various criteria in determining when an individual's rights to Miranda warnings are necessary.
In U. S. v. Montos, supra, the court said:
"These criteria include probable cause to arrest, subjective intent of the police, subjective belief of the defendant, and focus of the investigation."
The court went on to say:
"No single criterion is necessarily decisive. Instead, each case must be examined to determine whether there were present the compulsive factors with which Miranda was concerned."
In deciding whether the defendant is in custody, thus requiring warnings, the subjective beliefs of the defendant are not to be the determining factor. The thought processes of both the police and the defendant to the extent that they can be discerned are to be considered, but the real test is:
". . . not what the defendant * * thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes." Hicks v. United States, 127 U.S.App.D.C. 209, 382 F.2d 158.
The court in Hicks v. United States, supra, specifically rejected the claim that a *689 defendant's belief that he was under arrest was controlling. There the court said: ". . . his subjective beliefs are a factor but they must be considered by the trier along with evidence of his conduct and all the surrounding circumstances."
In Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714, the court stated:
"Moreover, the fact that a defendant is being interviewed in the police station does not necessarily mean that he is to be considered in custody."
This is merely one of the factors to be considered in reaching the decision. Further, the Supreme Court in Oregon v. Mathiason, supra, stated:
". . . a noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a `coercive environment.'
"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.
"But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him `in custody.' It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited."
The most compelling factor, the United States Court of Appeals, Fifth Circuit, said in Brown v. Beto, 468 F.2d 1284 ". . . whether or not the focus of the investigation has finally centered on the defendant."
Police interviews of suspects or defendants do not constitute in-custody interrogation even though the interviews may have been of extended duration and in some cases taken place at the police station. Commonwealth v. Fisher, 354 Mass. 549, 238 N.E.2d 525. In Fisher, supra, the defendant was questioned by the police along with several other persons who had been at a party with the deceased. Defendant's statement was inconsistent with other statements taken later and the police called the place where the defendant was living and left a message for him to come by the police headquarters, which he did. He went on July 11th, following the initial statement on July 1st.
While at the station, the police noticed some scratches on Fisher's neck and asked him about them. The police told Fisher to take off his shirt and he complied. There were additional scratches on his back. At that point, the officers told Fisher that he was a suspect and informed him of his rights.
In that case, the court ruled that the interrogation of the defendant became a custodial interrogation at the point when the scratches were noticed by the officers. It was then that the investigation had focused on the defendant. Up until that point, there was nothing to suggest that the defendant, who came to the station voluntarily had been deprived of his freedom in any significant way.
In Hicks v. United States, supra, the appellant called the police and told them there was an unconscious man in the room. When they arrived they found the man dead in bed as a result of stab wounds.
Appellant told the officers that the man had told her that he had been attacked as he was coming home from work. The police officer told the appellant that she would have to come to headquarters to prepare a written report of what she had told them. At that point, the officers did not consider her a suspect.
While at headquarters, appellant was interviewed for approximately two hours and *690 forty-five minutes. She made a statement and, as she read it, told the officers that she "was in trouble." The officers offered to let her call a lawyer and told her that she was only a witness. She was offered a ride home, but while waiting for a car to become available, she confessed. She was placed under arrest and given her rights.
Prior to trial, Hicks argued that her confession was inadmissible in the (1) it was during an illegal arrest, and (2) it was the product of custodial interrogation. The court stated in holding the confession admissible:
"The first . . . claim turn[s] on whether Appellant was under arrest when she left her room or at any point when she was engaged with police in preparing her report of the event. That answer must be found not merely in Appellant's subjective feeling as to whether she was under arrest but also in the nature of police intentions and actions in all the surrounding circumstances. `To constitute an arrest, there must be an actual or constructive seizure or detention of the person, performed with the intention to effect an arrest and so understood by the person detained.' Jenkins v. United States, 161 F.2d 99, 101 (10th Cir. 1947); . . . The thought processes of both the police and Appellant, to the extent they can be discerned, are considerations, but:
"`The test must be not what the defendant . . . thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.' United States v. McKethan, 247 F.Supp. 324, 328 (D.D.C. 1965) . . ."
The court went on to say that the defendant's beliefs are a factor in determining the point of arrest but they must be reviewed in the light of the evidence of his conduct and the surrounding circumstances.
No arrest occurred when the appellant was taken to police headquarters. The assumption that "one is required to cooperate with the police can hardly be equated with an arrest, every citizen has a duty to assist police officers up to a point of self-incrimination." Hicks v. United States, supra. In Hicks, the appellant was not arrested while at headquarters or before her confession. She was not restrained but was being treated as a witness. The court went on to say:
"[T]here were none of the familiar concomitants of arrest, e. g., searching, booking, fingerprinting, to negate the statements of police that Appellant was simply being interrogated as an important witness." Hicks v. United States, supra.
The Virgin Islands District Court in Government of Virgin Islands v. Kirnon, 377 F.Supp. 601, stated that custodial interrogation does not necessarily come about because the questioning occurred at the police station. The court said:
". . . more than official interrogation, or even suspicion of the person being questioned must be present. Some affirmative action by the authorities must indicate to the suspect that they would not have heeded a request to depart or have allowed him to do so."
In Taylor v. State of Arizona, 9 Cir., 471 F.2d 848, the court held that the fact of an arrest is governed by the facts and not the subjective intent of the arresting officer. The court said:
"A certain set of facts may constitute an arrest whether or not the officer intended to make an arrest and despite his disclaims that an arrest occurred."
In Taylor, supra, the petitioner was arrested when the police went to his apartment during an investigation of robbery. Petitioner fit the general description of the perpetrator. On entering the room, one of the officers had his gun drawn when the petitioner opened his door in response to the knock by the officers. See also U. S. v. Richards, 9 Cir., 500 F.2d 1025. There it was held that requiring men to disembark from an airplane for questioning was not an arrest although they were ordered to do so at gunpoint. See U. S. v. Strickler, 9 Cir., 490 F.2d 378; U. S. v. Lampkin, 3 Cir., 464 F.2d 1093.
*691 In the present case, the record of the suppression hearing indicates that although the questioning took place in the sheriff's office it in no way indicated that the respondent's freedom to depart was restricted in any way. The record supports the conclusion that Malone voluntarily went to the sheriff's office, voluntarily answered questions, submitted to the pubic hair combing, the search of his car, photographing by Deputy Amberson, and the ultimate search of his apartment.
In the present case, nothing was ever shown to indicate that had Malone expressed a desire to end the interview the police would not have acceded to his request. Even if Malone had such a belief that alone cannot be legally sufficient to establish his arrest before the police officers in fact acted in such a manner as to constitute some control over his person. See United States v. Brunson, 5 Cir., 549 F.2d 348, 358.
Although it may be inferred that Malone felt obliged to cooperate with the law enforcement officers in order to maintain his facade of innocence, this subjective view by the defendant does not require that a reviewing court find him to have been in custody.
The facts in the present case indicate that this was an ongoing investigation and that Malone was one whom the police suspected. The investigation had not focused on him specifically and it was only when the bloody clothing was found outside the apartment that the process shifted from investigatory to accusatory. Escobedo, supra.
It cannot be said that the officers could under any legal theory hold Malone if he had decided to leave. Only when the bloody clothing was found did the investigation center on Malone. Up until that time the officers had nothing on which an arrest could be predicated.
Because Malone was being questioned as one whom the police suspected did not convert the situation into a custodial interrogation requiring the Miranda warnings.
The trial court considered the totality of the circumstances and concluded that the appellant voluntarily, intelligently, and without coercion, consented to the search of the automobile, the pubic hair combing, the search of the apartment, and that he freely made a confession on February 6, 1975.
Although during the suppression hearing the testimony of the appellant was in many respects in conflict with that of the officers, nonetheless, these were questions for the presiding judge and he resolved them against the appellant.
Clearly, sufficient evidence is shown in this record to support the conclusion that Malone's acts were voluntarily, intelligently and understandingly done without coercion.
After reviewing the trial record we are convinced that the evidence was sufficient to present a question for the jury. Young v. State, 283 Ala. 676, 220 So.2d 843.
Accordingly, the judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.